<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOSE LOPEZ and GRACIELA GOMEZ,<br><br>Plaintiffs,<br><br>v.<br><br>HONEYWELL INTERNATIONAL, INC., CONSULTING & TESTING SERVICES, INC., JOHN DOE, (fictitious person,) JANE DOE, (fictitious person,) and ABC COMPANY, INC., (fictitious Entity).<br><br>Defendants. | Civ. No.  10-03518 (KM)<br><br>**O P I N I O N** |

*Appearances by:*

Vincent L. Gonzalez, Esq.
NAPOLI BERN SILVERSTEIN, LLP
350 Fifth Avenue, Suite 7413
New York, NY 10118

> *Attorney for Plaintiffs*

Michael B. Oropollo, Esq.
Peter M. Mueller, Esq.
HARWOOD LLOYD, LLC
130 Main Street
Hackensack, NJ 08901

> *Attorneys for Defendant Honeywell International, Inc.*

Sunny M. Sparano, Esq.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
425 Eagle Rock Avenue
Roseland, NJ 07068

> *Attorney for Defendant Consulting & Testing Services, Inc.*

<u>**DEBEVOISE, Senior District Judge**</u>

The case arises out of claims of negligence and violations of the Occupational Safety and Health Act ("OSHA") brought by Plaintiffs Jose Lopez and his wife Graciela Gomez, pursuant to a workplace slip and fall which Mr. Lopez suffered while he was employed by Par Environmental Corp. ("PAR").  The defendants in this action are the premises owner, Honeywell International, Inc. ("Honeywell") and Consulting & Testing Services, Inc. ("CTSI"), which contracted with Honeywell to oversee the asbestos abatement project on which Mr. Lopez was working.

The matter comes before the Court upon motions and cross-motions for summary judgment filed by Honeywell and CTSI (collectively, "Defendants").  Additionally, the Court considers CTSI's motion for leave to file a third-party complaint against PAR.  For the reasons stated below, the motions are DENIED.

## I.      BACKGROUND

### A.  Factual History

#### 1.  The Incident

On July 11, 2008, Mr. Lopez fell from a scaffold while performing asbestos abatement work at a facility owned by Honeywell in Morristown, New Jersey.  At that time, Mr. Lopez was employed by PAR to perform asbestos abatement work at the Morristown facility pursuant to a contract between Honeywell and PAR. Mr. Lopez allegedly suffered serious and permanent injury from the fall which causes him to be unable to attend to his usual vocation and activities, and has been further damaged by the medical aid and attention which he must seek.  As a result, Mr. Lopez requests damages in the amount of fifty million dollars.  As the spouse of Mr. Lopez, Ms. Graciela Gomez requests relief in the same amount, for her continued care and treatment for

Mr. Lopez, treatment-related expenses already paid, and for loss of consortium and enjoyment of life.  Ms. Gomez's claims are derivative of Mr. Lopez's request for relief.

Mr. Lopez does not recall the details of the incident.  He was injured as a result of falling from the plastic-covered scaffold on which he was standing while spraying asbestos removal solvents which apparently caused the scaffold to be wet and slippery.  After the accident, safety measures were implemented on the scaffolds.  Specifically, railings were installed on all the scaffolds on site, and repurposed carpeting was stapled to the scaffolds to avoid the slickness of the originally affixed plastic.

The record contains mixed testimony as to the height of the scaffold from which Mr. Lopez fell.  The police investigation taken at the scene includes two witnesses who reported that the scaffold was approximately six feet from the ground.  (Police Report, Gonzalez Cert., Ex. A, Doc. 63.)  However, Mr. Kosakowski, Project Manager for CTSI, maintains that the scaffold height was five feet. (Kosakowski Email, Feb. 18, 2014 Mueller Cert., Ex. G, Doc. 78)[1]

Moreover, the foreman reported that the scaffold was properly assembled and did not appear to be hazardous. (Police Report, Gonzalez Cert., Ex. A, Doc. 63.)  Additionally, a witness told the police that Mr. Lopez took a step back from the scaffold and misjudged the edge. (Id.)

2. *Contracts*

The record contains two primary written agreements: 1) the Honeywell-PAR contract, and 2) the Honeywell-CTSI proposal.  The bounds of these agreements being at issue, the Court sets forth the relevant contractual terms below.

---

[1]     The height of the scaffold is at issue because the Honeywell Safety Handbook requires fall protection devices for all scaffolding six feet above supporting work surfaces.  (Honeywell Safety Handbook, June 17, 2013 Sparano Cert., Ex. E at 14.)  In comparison, the relevant OSHA regulations require fall protection when scaffolding is more than ten feet above the lower level, which is clearly inapplicable here.  See 29 CFR 1926.451(g)(1).

A.  *The Honeywell-PAR Contract*

On January 31, 2008, Honeywell and PAR entered into a contract for "ACM Full

Encapsulation Services with Global Encasement (GE) Product."  Article VI of the Honeywell-

PAR contract provides standards regarding health, safety, security, and the environment:

1. In execution of the Work, Contractor [Par] shall comply, and
shall cause its employees and all of Contractor's lower tier
contractors and their employees, to comply with the agreed
safety regulations listed in Honeywell's CD-13 ("Health,
Safety, Security and Environmental Specification for
Contracted Services"), which are attached in Section IV and
with all applicable health, safety, security, and environmental
standards, rules and binding relations under federal, state or
local law.  Contractor shall have the primary responsibility for
notifying and training its employees, subcontractors, and
agents with respect to the regulations listed in CD-13, and
procedures and any other applicable governmental laws or
regulations.  Unless otherwise agreed in writing, Contractor
shall supply all health or safety equipment or materials used in
or required in the performance of the Work.  The safety of all
persons employed by Contractor and its subcontractors at the
Job Site, or any other person who enters upon the Job Site at
Contractor's direction, for reasons relating to the Contract,
shall be the responsibility of Contractor.  Neither the issuing of
work permits or safety permits by Honeywell for Work in areas
where such permits are required, nor the issuing of safety
regulations by Honeywell, shall be deemed to relieve
Contractor of any of its responsibilities under this Article VI.
2. Contractor's Representative shall supervise health and safety
matters during performance of the Work.  Contractor shall
confine its employees and all other persons who come at
contractor's request onto the Job Site to roads leading to and
from the Job Site and to any other area which Honeywell has
specifically authorized contractor to use.
3. Contractor shall take all reasonable measures and precautions
at all times to prevent injuries to, or death of, or damage to
property of, any of its employees or any other persons who
enter upon Honeywell's premises.

4

4. Such measures and precautions shall include, but shall not be limited to all safeguards and warnings necessary to protect workmen and others against any conditions on Honeywell's premises, or on the Job Site respectively, which could be dangerous, and prevention of accidents of any kind whenever work is being performed in proximity to any moving or operating machinery, equipment or facilities, whether such machinery, equipment or facilities are the property of, or are being operated by, the Contractor, its subcontractors, Honeywell or other persons.

5. In the event that Contractor, or Honeywell as the case may be, has not taken all necessary safety precautions stipulated or referred to in this Contract, and/or either of them does not met all safety requirements stipulated or referred to in this Contract, or in the event of any unsafe working condition or work environment at the Job Site, Contractor or Honeywell, as the case may be, shall immediately notify the other and the work concerned shall be interrupted immediately and shall not be restarted until all such safety precautions have been taken and all such safety requirements have been met. . . .

6. Contractor shall become familiar with all of Honeywell's applicable rules provided to Contractor by Honeywell prior to commencement of the Work at the Job Site, including those for plant and occupational safety and health, fire protection and environmental control.  Contractor shall advise Honeywell, and Honeywell shall advise Contractor whenever a condition at the plant affects the Work or performance of the Work or creates an unsafe condition or work environment.

(Honeywell-PAR Contract, June 17, 2013 Sparano Cert., Ex. B at 9-10.)

Article VIII of the Honeywell-PAR contract provides for indemnification

by PAR:

1. Contractor shall be responsible for and shall indemnify, exonerate and save harmless Honeywell, it's [sic] officers, agents and employees, from and against:

[ . . . ]

5

(c) any and all liability, damage, loss, cost, expense, claims, demands suits, actions, judgments, or recoveries for or on account of any injury to or death of persons or damage to property, including, but not by way of limitation, damage to property of Contractor, Honeywell or others, or injury, death of, or damage to property of Honeywell's or Contractor's officers, agents, employees, servants or representatives, arising out of, or in any way occurring directly or indirectly in connection with the [PAR's] Work, including without limitation, delegable or non-delegable duties imposed on Contractor or Honeywell by law, whether or not any such injury, death, or damage may have been caused, or alleged to have been caused, by the negligence (whether classified as active, passive or otherwise) of Honeywell, of the condition of the premises or otherwise; and Contractor shall at its own expense defend any and all actions based thereon. Any loss, damage, cost or expense incurred by Honeywell in connection with the foregoing may be deducted from Contractor's compensation then due or thereafter to become due, in addition to any other remedy that Honeywell may have.

(<u>Id.</u>)

B. *Honeywell's Safety Handbook*

Honeywell's Safety Handbook, also referenced in the first paragraph in Article VI of the Honeywell-PAR Contract, requires Contractors to comply with health, safety, and environmental rules while at the Morristown facility, including those of OSHA, Honeywell, Local, State, Federal and of the Contracting Company. Additionally, Contractors must provide all required Personal Protective Equipment (PPE) prescribed for work in the specific area to their employees, including clothing, hardhats, harnesses, eye and face protection, hand and arm protection, foot and respiratory protection. Regarding asbestos removal and abatement, Contractors must comply with all applicable Federal, State and Local requirements for the protection of Contractors, Honeywell employees, and the general public.

6

Regarding precautions for scaffolding at a certain height, the Honeywell Safety Handbook mandates the use of safety harnesses for work performed on "all scaffolding 6 feet above supporting work surface, when working on the sixth step or higher on a ladder" and "any unguarded areas 6 feet above any supporting work surface." (Honeywell Safety Handbook, June 17, 2013 Sparano Cert., Ex. E.)

Further, the Honeywell Safety Handbook requires the Contractor to acknowledge receipt and abide by its terms, and to attend an orientation on its contents which is conducted by Honeywell. (Id.)

C. *The Honeywell-CTSI Contract*

The second contract at issue is the agreement between Honeywell and CTSI. (Honeywell-CTSI Contract, June 17, 2013 Sparano Cert., Ex. D.) On February 12, 2008, Honeywell accepted CTSI's proposal, which was submitted on January 22, 2008, for "asbestos related management and testing services to be performed" at the Morristown facility at issue. (Id.) Specifically, the proposal outlines "asbestos consulting services to be performed" at the facility. Phase I of the proposal relays the scope of work and request for proposal preparation. These items are "prepared to assure compliance with applicable Honeywell International, Inc., Federal and State Rules & Regulations and Statutes concerning asbestos encapsulation and waste disposal." Accordingly, the scope of work and request for proposal are "tailored specifically for the project" and address:

> General Bid Package Information
> Special Conditions
> Bid Forms
> Damaged Fireproofing Repair Procedures
> Global Encasement Application Specifications
> Floor Drawings
> Bidding requirements and general conditions
> Project documentation

Sequence of work and scheduling
Air monitoring parameters and requirements
Decontamination procedures
Work area preparation
Clean-up procedures

(Id.)

Phase II of the Honeywell-CTSI proposal is entitled "Project Management and Onsight

Project Monitoring," and sets forth that:

> *CTSI will provide project management during the asbestos abatement projects.  Pre, during and post project meetings will be held with the ACM Service Provider and building staff to discuss all project-related activities*.  CTSI will gather and review project-related documentation, permits and insurance certificates.
>
> CTSI will serve as a *liaison* for Honeywell International, Inc. and the ACM Service Provider awarded the contract, and any additional contractors and technical personnel required for the project.
>
> CTSI will oversee quality control of air sampling data, *ACM Service Provider's abatement work practices*, engineering controls, *visual inspections of containment areas*, and review of all ACM Service Provider's post project documentation submittals.
>
> (Id. at 2-3, emphasis added.)

Phase IIB of the Honeywell-CTSI proposal covers CTSI's performance of asbestos compliance

air monitoring.  Phase IIC covers VOC and Airborne particulate monitoring.

On February 28, 2008, Honeywell issued Purchase Order 4942898 to retain CTSI for

$75,000 pursuant to the work scope detailed in the January 22, 2008 Honeywell-CTSI proposal,

and pursuant to a Master Service Agreement ("MSA") dated November 8, 2008.  (Purchase

Order, Jan. 24, 2014 Mueller Cert., Ex. B.)  The record does not include a 2008 MSA, and it is

not clear whether one exists, and/or whether the 2008 referred to in the Honeywell-CTSI

proposal is a typographical error for a 2007 agreement.  CTSI offers no explanation for why the

8

February 2008 Purchase Order would reference a later-dated November 2008 MSA.  Notably, CTSI does not include the purported 2008 MSA in the record.  In turn, Honeywell contends that the 2008 MSA referred to in Purchase Order 4942898 is a typographical error, and that it in fact applies to a 2007 MSA which it attaches to the record.

Accordingly, the record includes a 2007 MSA between Honeywell and CTSI for safety, health and environmental audits.  (2007 MSA, Aug. 5, 2013 Mueller Cert., Ex. I.)  Article 3.2 therein binds CTSI to comply with Honeywell's safety protocol.  Article 3.1 therein specifies that CTSI and its employees are not agents of Honeywell for any purposes.  Article 9 therein provides that CTSI agrees to indemnify Honeywell for CTSI's acts or omissions for services performed. Additionally, Article 14.8 provides that the "Agreement, including the Statement of Work and all Exhibits, may not be renewed, changed, modified or amended without a writing signed by both parties.  Any written modification, amendment or supplement amends only the Statement of Work, unless otherwise specifically provided." (Id.) [2,3]

---

[2] Article 3.2 of the 2007 Master Service Agreement sets forth that CTSI "will comply with Honeywell's security procedures, rules, regulations, policies, working hours and holiday schedules while on Honeywell's premises."

Article 3.1 of the 2007 MSA sets forth that the "parties agree that Supplier [CTSI] is engaged in an independent business, and will perform its obligations under this Agreement as an independent contractor.  Supplier's personnel are not Honeywell's agents or employees for federal tax purposes or any other purposes whatsoever, and are not entitled to any Honeywell employee benefits."

Article 9 of the 2007 MSA provides for indemnification from damages arising out of acts or omissions of CTSI, its employees, or agents of any subcontractor retained by CTSI in connection with the services of the agreement:

> Supplier [CTSI] agrees to indemnify, defend and hold Honeywell and its respective directors, officers, employees and agents, and its clients, harmless from and against any and all liabilities, losses, damages, costs and expenses, including, without limitation, attorneys' fees, costs, and disbursements, arising out of the acts or

The seemingly boilerplate "master" terms of the 2007 MSA are pertinent insofar as no subsequent writing has been produced to indicate a renewal, change, modification, or amendment of it as required by Article 14.8 therein.  Moreover, any such modification would amend only the Statement of Work unless otherwise specifically provided.  In the absence of a subsequently produced written agreement, the 2007 MSA is relevant to the discussion below.[4]  A genuine issue of material fact remains as to the existence and terms of the purported 2008 MSA, and/or as to whether Purchase Order 4942898 simply contains a typographical error.

   *3. Defendants' relationships*

   Only persons with a license were allowed to enter the containment area of the job site unaccompanied.  Since Honeywell personnel were not licensed to enter into the containment area, Honeywell relied on its contractually-agreed-upon liaison, CTSI, to prepare Visual Assessment reports for Honeywell regarding the work being performed therein. (Aug. 5, 2013 Mueller Cert., Ex. A.)

---

> omissions of Supplier, its employees, agents or of any
> subcontractor retained by Supplier in connection with the
> performance of the Services under this Agreement, including: acts
> or omissions that cause bodily injury or death or physical damage
> to tangible property . . .

   Last, Article 14.8 provides that the 2007 MSA, "including the Statement of Work and all Exhibits, may not be renewed, changed, modified or amended without a writing signed by both parties.  Any written modification, amendment or supplement amends only the Statement of Work, unless otherwise specifically provided."

[3]   Exhibit 1 to the 2007 MSA in the record is a Statement of Work dated October 15, 2007, and applies to the performance of a safety, health and environmental audit of a Honeywell Mexicali TS facility for the week of November 12, 2007, at a cost of $4,400 plus travel expenses.  The Statement of Work in Exhibit 1 of the 2007 MSA is clearly irrelevant here.

[4]   Fed. R. Ev. 401 provides that evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

The deposition testimony is additionally enlightening as to the parties' understanding of the scope and nature of their responsibilities.

### a.   Mr. Garcia, Honeywell Corporate Manager

Mr. Ernie Garcia, Honeywell's Corporate Manager who was assigned to oversee the project when Mr. Lopez fell, and the individual responsible for the facility's health, safety, and environmental protocol, maintained that CTSI was not responsible for the safety of PAR employees while they were performing asbestos abatement work.  (Garcia Tr., June 17, 2013 Sparano Cert., Ex. C.)  Mr. Garcia described that CTSI "was hired to oversee, or at least guarantee that the work being done by PAR was in adherence to whatever laws and regulations regarding asbestos abatement.  They were also hired to document the work that was being done by PAR as well as monitor the environment around the containment area." (Id. at 14:5-12.)  Mr. Garcia further clarified that the CTSI was to guarantee that the work done within the contained area was in compliance with the EPA guidelines and OSHA, "in the context of the asbestos abatement." (Id. at 82:7-16.)  Specifically, Mr. Garcia testified that CTSI was not responsible for the safety of PAR employees while they were performing abatement work, and that the responsibility for safety of PAR employees fell on PAR. (Id. at 107:9-20.)  Further, Mr. Garcia admitted that it was PAR's "sole responsibility" to make sure that the equipment they owned and provided, including the scaffolds, was safe. (Id. at 116:6-11.)  Last, Mr .Garcia noted that determination of the appropriate levels of worker safety equipment and procedures was to be made by the contractor, PAR. (Id. at 101:9-16.)

 Mr. Garcia testified that CTSI, as the consultant, was not expected to be responsible for inspecting the ladders or scaffolds that were being used in the containment area.  (Id. at 127:11-23.)  "All the equipment – ladders, scaffolds, tools, et cetera – should belong to the contractor.

We don't provide any – the consultants usually don't provide any, and therefore, it's the responsibility of the owner or the contractor to inspect their own equipment." (Id.)

       *b.   Mr. Zahorsky, PAR Project Supervisor*

Mr. Miroslav Zahorsky, PAR's supervisor for this project, testified that PAR, and not CTSI, was responsible for the safety of its employees, including the equipment used by them:

> Q.  Is PAR responsible for the safety of the equipment used by its employees?
> A.  Yes.
> Q.  Okay.  You said that you believed CTSI oversaw PAR, correct?
> A.  Yes.
> Q.  When you say that, what are you referring to:  PAR's abatement work?
> A.  Yes.
> Q.  Do you understand CTSI to be responsible for the safety of PAR's employees?
> A.  I don't think so.

> (Zahorsky Tr. at 84:15 – 85:1, June 17, 2013 Sparano Cert., Ex. F.)

For example, PAR conducted regular safety meetings with its employees at the project, which included discussion as to the proper and safe use of scaffolds, falling hazards, personal protective equipment, and ladder use.  (Id. at 55:19 – 60:12.)  Moreover, after Mr. Lopez's accident, PAR replaced the plastic previously used on scaffolds with carpet to prevent the dangerous and slippery condition created by the plastic.  (Id. at 62:5 – 65:3.)

Mr. Zahorsky also described CTSI's supervisory role.  Specifically, Mr. Zahorksy testified that CTSI had the authority to stop the project if something was wrong, and had the authority to direct that PAR do something differently if necessary. (Id. at 46:5-9.)   For example, Mr. Zahorksy testified that it was a part of the job of the CTSI project manager to make sure that regulations were followed, such as the need to put more plastic on the floor to seal the area and make it easier to clean. (Id. at 40:24-41:24.)

Of note, Mr. Zahorsky also testified that he had no knowledge of the details of the CTSI contract.

### c. Mr. Selamie, CTSI President and Owner

Mr. Farshad Selamie, CTSI's President and Owner, testified that although PAR provided all equipment to its employees, if CTSI saw something it considered dangerous in the worksite area, it would bring it to the attention of PAR's supervisor. (Selamie Tr. at 38:7-29:2, 115:4-14, June 17, 2013 Sparano Cert., Ex. G.)  For example, in the case of excessive water accumulation on the floor, CTSI would ask the contractor to clean it up immediately to make sure that nothing would leak to adjacent levels. (Id. at 138:1-15.)

### d. Emails by Mr. Kosakowski, CTSI Project Manager

A series of emails by Mr. Michael Kosakowski, Project Manager for CTSI, further evidences CTSI's scope of involvement.  On June 24, 2008, Mr. Kosakowski emailed individuals at Honeywell, CTSI, and PAR, regarding the condition of the floor and the need to remove debris and pre-clean the floor for carpet removal prior to the hanging of plastic to seal the clean-up.  (Email, Aug. 5, 2013 Mueller Cert., Ex C.)

On June 27, 2008, Mr. Kosakowski emailed various individuals at PAR, CTSI, and Honeywell, regarding the plasterizing process, the accessibility of emergency pull stations and fire extinguishers based on conversations with Honeywell, and a potential obstacle in the encapsulation.  (Id., Ex. D.)

On July 9, 2008, Mr. Kosakowski sent an email which sought to resolve an issue with a leak, and apologized therein for CTSI's placement of a chair in front of a staircase door which Honeywell flagged as a serious fire code violation. (Id., Ex. E.)

### 4. Expert Testimony

For reasons explained further below, the expert reports are not taken into consideration here.   For thoroughness, the Court summarizes the findings by the experts.

       a.  Hopkins Reports

Mr. Lopez provided two expert reports by Kathleen V. Hopkins, R.N., CSSM, which sets forth various conclusions as to the cause of the accident. (Hopkins Reports, Feb. 18, 2014 Gonzalez Cert., Exs. C, D.)  Ms. Hopkins lists that the accident was directly caused by:

1. The Defendants, and each of them, failed to ensure that a safe means of vertical access was provided for the Plaintiff to safely reach and work at the ceiling level.
2. The Defendants, and each of them, failed to ensure that the scaffold was inspected for visible defects by a competent person before each work shift in that a competent person would have recognized the need for guardrails and outriggers on the scaffold. 1926.451(f)(3).
3. The Defendants, and each of them, failed to ensure that the scaffold was erected and moved under the supervision and direction of a competent person qualified in scaffold erection and moving and that such activities were performed only by experienced and trained employees selected for such work by the competent person. 1926.451(f)(7).

      (Id., Ex. C at 6.)

Ms. Hopkins concluded:

> It is unknown if the tipping over of the scaffold is what caused the plaintiff to fall off the scaffold platform.  The scaffold was wet and thus slippery from the encapsulation substance and it is also unknown whether the Plaintiff slipped on the scaffold platform wet plastic as the mobile scaffold was being manually moved or intentionally took a step back when the accident occurred. . . . It is also unknown if "the surface on which the scaffold is being moved is within 3 degrees of level, and free of pits, holes and obstructions" as required by OSHA . . .

      (Id. at 4.)

Notably, Ms. Hopkins's report conflicts with direct witness testimony that the scaffold was not being moved, and lacks factual support for the notion.  Moreover, Ms. Hopkins concludes that the Defendants were liable for the accident, despite her acknowledgment that the cause of the fall

was uncertain, and without additional factual support to explain why Defendants would be liable under the circumstances.

      b.   Naughton Report

Additionally, Honeywell submitted an expert report by Henry R. Naughton, P.E. of Affiliated Engineering.  (See Naughton Report, Jan. 25, 2014 Mueller Cert., Ex. G.)  Mr. Naughton reviewed the record here and concluded that "the plaintiff's fall was not the result of any shortcoming on the part of Honeywell International to have provided for a reasonable standard of care to PAR Environmental and its employees.  The plaintiff's fall transpired as a consequence of PAR Environmental not adequately monitoring the manner in which plaintiff was performing his assigned work task." (Id.)

**B.  Procedural History**

On November 28, 2011, Plaintiffs filed a First Amended Complaint against Honeywell and CTSI for negligence and violations of the Occupational Safety and Health Act ("OSHA"). The thrust of the complaint is that Defendants failed to assure the safety of the worksite, thereby causing Mr. Lopez to fall from the scaffold on which he was working and sustain personal injuries.

On December 5, 2011, Honeywell filed an Answer with crossclaims for contribution, indemnification and breach of contract against CTSI.  On June 1, 2012, CTSI filed an Answer with crossclaims for contribution and indemnification against Honeywell.  Various motions for summary judgment followed, and are currently pending before the Court.

On June 17, 2013, CTSI filed a motion for summary judgment against Plaintiffs and Honeywell's crossclaims.  CTSI argued that it had no contractual obligation or responsibility to ensure safety of the worksite to prevent Mr. Lopez's fall.  Second, CTSI argued for the dismissal of Honeywell's crossclaims because they are derivative of Plaintiffs' direct claims against CTSI,

and because there was no contract or agreement between Honeywell and CTSI to support Honeywell's crossclaims for indemnification and breach of contract.

On January 24, 2014, Honeywell filed a motion for summary judgment in which it argued that it is not liable for Mr. Lopez's fall because it did not breach its duty as landlord, and because it exerted no degree of control over the operations within the containment area.

The same day, CTSI also filed its second motion for summary judgment, arguing a lack of viable expert opinion against it. Like its June 17, 2013 motion, CTSI argued that the evidence does not demonstrate an obligation to ensure the safety of Mr. Lopez. Whereas its June 17, 2013 motion relied on the lack of the existence of a contractual duty, the January 24, 2014 motion pointed to the absence of valid expert opinion as to the point. CTSI argued that expert testimony is required to establish liability here, and that the claims against it must be dismissed in the absence of valid expert opinion.

On February 18, 2014, CTSI filed a cross-motion for summary judgment seeking to dismiss all claims against it, which essentially reiterates its prior arguments. On May 9, 2014, CTSI filed a motion for leave to file a Third-Party Complaint against PAR.

## II.     ANALYSIS

### A.  Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must be able to "affect the outcome of the suit under governing law." Id.

16

The party moving for summary judgment has the burden of establishing the nonexistence of a "genuine issue." Celotex, 447 U.S. at 330. The moving party may satisfy this burden by either: (1) submitting affirmative evidence that negates an essential element of the non-moving party's claim; or (2) demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's case. Id. at 331.

Once the moving party satisfies this initial burden, the non-moving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(3); Celotex, 447 U.S. at 324. To do so, the non-moving party must offer specific facts that establish a genuine issue of material fact, rather than simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To survive summary judgment, the non-moving party ultimately must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 447 U.S. at 322.

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pennsylvania Coal Ass'n v. Babbit, 63 F.3d 231, 236 (3d Cir. 1995). "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). However, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

"[O]nly evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F. Supp. 474, 482

(D.N.J. 1995).  Here, the Court disregards the Hopkins reports pursuant to Fed. R. Ev. 702[5]  as

inadmissible net opinion. The reports are simply unsupported by the evidence.  Specifically, Ms.

Hopkins provides no evidence to support her finding that the scaffold was not being inspected

for visual defects, that the scaffold was being moved in the first place, and that that supervisors

failed to ensure that it was being moved properly.  Moreover, Ms. Hopkins concludes that the

Defendants are liable for the accident based on the foregoing, despite her acknowledgement that

the cause of the fall was uncertain.

      The Naughton Report is not taken into consideration today either, but for different

reason.  Fed. R. Ev. 702 sets forth the admissibility of expert testimony under a certain set of

factors, including that the "expert's scientific, technical, or other specialized knowledge will help

the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702(a).

The facts in this case are not so complicated as to require expert testimony.  A jury is adequately

competent to understand the terms of the relevant contract agreements and the factual

background, so as to not require some specialized knowledge to determine liability arising from

a worksite slip and fall.

---

[5]      According to Fed. R. Ev. 702 (testimony by expert witnesses):

      A witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify in the form of an
opinion or otherwise if:

    (a) The expert's scientific, technical, or other specialized knowledge
will help the trier of fact to understand the evidence or to
determine a fact in issue;
    (b) The testimony is based on sufficient facts or data;
    (c) The testimony is the product of reliable principles and methods;
and
    (d) The expert has reliably applied the principles and methods to the
facts of the case.

### B.  Discussion

In New Jersey, the requisite elements of a negligence cause of action are:  (1) the existence of a duty; (2) the breach of that duty; and (3) proximate causation ("but for" the negligence the plaintiff's damages would not have occurred); and (4) actual loss or damages. See Conklin v. Weisman, 145 N.J. 395 (1996).

The question of whether a duty exists is a matter of law to be decided by the court.  City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 59 (2001).  "The ability to foresee injury to a potential plaintiff does not in itself establish the existence of a duty, but it is a crucial element in determining whether imposition of a duty on an alleged tortfeasor is appropriate." Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 572 (1996) (citing Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194 (1994)).  "Once the foreseeability of an injured party is established, . . . . considerations of fairness and policy govern whether the imposition of a duty is warranted." Carter Lincoln-Mercury, Inc., 135 N.J. at 194-95.  "The assessment of fairness and policy 'involves identifying, weighing, and balancing several factors – the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Carvalho, 143 N.J. at 573 (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

In Carvalho, the New Jersey Supreme Court considered the question of whether an engineer has a legal duty to exercise reasonable care for the safety of workers on a construction site when the engineer has a contractual responsibility for the progress of the work, but not for safety conditions, yet is aware of working conditions on the construction site that create a risk of serious injury to workers.

Carvalho noted that the engineer's supervisory responsibility necessarily entailed the observation of existing conditions and the actual performance of the work undertaken by the

workers at the site.  Id. at 574.  Although the engineer was not contractually responsible for

safety conditions, Carvalho reasoned that "there was an overlap of work-progress considerations

and work-safety concerns.  Matters of construction-site safety did not bear indirectly on the

engineer's contractual responsibility for supervising the progress of the work.  Indeed, common

sense tells us that an accidental injury or death on the work site because of the failure to take

safety measures would directly affect the progress of the work by bringing it to a halt."  Id. at

575.

> The connection between the engineer's responsibilities over the
> progress of work and safety measures at the job is relevant in
> determining whether it is fair to impose a duty of care addressed to
> work site safety conditions.  *Cf. Sykes v. Propane Power Corp.,*
> *224 N.J. Super. 686, 541 A.2d 271 (App. Div. 1988)* (holding that
> engineer responsible only for plans to upgrade a chemical recovery
> plant to meet environmental regulations did not have sufficient
> relationship to co-worker's hazardous practices that resulted in
> accidental explosion to warrant imposition of duty of care); *Young*
> *v. Eastern Engineering & Elevator Co., 281 Pa. Super. 428, 554*
> *A.2d 77* (imposing no duty on architect who had no responsibility
> to supervise or control construction other than to make brief,
> periodic inspections of construction quality), *appeal denied, 524*
> *Pa. 608 & 611, 569 A.2d 1367 & 1369 (1989).*
>
> Id.

In considering the fairness in imposing a duty of care, Carvalho additionally took into

consideration the element of control arising from the relationship between the parties and the

opportunity and capacity of the defendant to have avoided the risk of harm, and the actual

awareness or knowledge of the risk of harm.  "The record combined with all inferences favorable

to plaintiff supports a factual finding that [the engineer] in fact knew of the danger.  The

inspector was at the construction site every day and monitored the trench that eventually

collapsed.  Trench conditions were specifically part of the engineer's contractual concerns and

[the inspector] knew of the condition of the trench.  [The inspector] was aware that the trench collapsed in other areas and it was unstable in other areas including a point 200 yards from the fatal collapse one week before the accident." Id. at 578.  Carvalho concluded that the engineer had the opportunity and was in a position to foresee and discover the risk of harm and to exercise reasonable care to avert the harm.  Thus, both the engineer and the inspector owed a duty of care to the deceased worker. Id.

CTSI moves for summary judgment on the basis that it had no contractual duty or obligation to ensure Mr. Lopez's safety.  CTSI argues that the Honeywell-PAR contract addresses the responsibilities for site safety and that the agreement specifically vested the responsibility for site safety with PAR within Article VI of the Honeywell-PAR contract. Additionally, CTSI argues that expert testimony is required here to establish its liability, and that Mr. Lopez's expert report is merely net opinion and unsupported by the record.  Thus, CTSI argues that in the absence of valid expert opinion, all claims against it must be dismissed.

CTSI attempts to minimize its involvement in the project by focusing on its consulting and air monitoring roles.  However, the Honeywell-CTSI proposal broadly vests supervisory responsibilities within CTSI for the Honeywell Project.  Phase II of the proposal is entitled "Project Management and Onsight Monitoring," and includes responsibilities such as "project management during the asbestos abatement project[;]" facilitation of "[p]re, during and post project meetings . . . to discuss all project-related activities[;]" and that CTSI is to "serve as a liaison for Honeywell International, Inc. and the ACM Service Provider awarded the contract." Additionally, CTSI is to oversee "ACM Service Provider's abatement work practices" and conduct "visual inspections of containment areas."

Indeed, CTSI practically served as Honeywell's eyes and ears within the facility since Honeywell was not permitted to enter the containment area without accompaniment. CTSI's project management, on-sight monitoring, and liaising role conferred a duty to ensure safe working conditions during the asbestos removal process within the containment area. The Court is persuaded by the reasoning reached by the New Jersey Supreme Court in Carvalho that the connection between responsibilities over work progress and safety measures is a matter of "common sense." 143 N.J. at 575. The facts here are arguably stronger than those in Carvalho where the engineer simply played a supervisory role over work progress, because here, in addition to supervising, CTSI additionally agreed to serve as a liaison for Honeywell.

Relatedly, CTSI contends that no improper procedures or work practices have been evidenced because the OSHA scaffold requirement, 29 CFR 1926.451(g), applies to scaffolds that are at least ten feet in height, which is undoubtedly not the case here. CTSI further maintains that the use of plastic on a scaffold is not a violation of any OSHA regulation or any other regulation in connection with abatement procedures, and therefore does not indicate negligence. First, CTSI does not provide any case law in support of the proposition that the lack of an OSHA violation *ipso facto* negates a negligence claim. Indeed, the causes of actions are unique and are not mutually exclusive. Second, the Court is not persuaded that an OSHA violation may not have been violated here. Although fall protection is required for scaffolds over ten feet in height, 29 CFR 1926.451(f)(3) applies to the structural integrity of scaffolds in general and directs that: "[s]caffolds and scaffold components shall be inspected for visible defects by a competent person before each work shift, and after any occurrence which could affect a scaffold's structural integrity." The use of plastic to cover a scaffold from which a slippery substance is being sprayed may be a defect visible upon inspection prior to each work shift; this

22

is a question for the trier of fact.  Moreover, the Court notes that the Honeywell Safety Handbook itself requires guardrails for scaffolds set at a height of six feet.  Should a trier of fact conclude that the scaffold here was placed at six feet rather than five feet, the scaffold would therefore be required to be affixed with guardrails pursuant to the Honeywell policies which CTSI agreed to, at least pursuant to the 2007 MSA.

CTSI's reliance on Tarabokia in support of its position is unavailing.  See Tarabokia v. Structure Tone, 429 N.J. Super. 103 (App. Div. 2012).  In Tarabokia, the New Jersey Appellate Division examined the work-related injury suffered by an electrical subcontractor's employee from the use of a tool with an extension pole without protective gloves, which later resulted in polyneural compression syndromes.  The Appellate Division considered whether under the circumstances presented there, a general contractor has a duty to assure the safety of an employee of a subcontractor, and, more specifically, whether the scope of that duty encompasses the manner and means of using equipment supplied by the subcontractor's work site.  Tarabokia took into consideration the latency of the injury and the general contractor's lack of knowledge about the worker's use of the tool.  Additionally, Tarabokia noted the lack of a contractual agreement to provide safety oversight, and that nothing in the relationship between the general contractor and the subcontractor suggested that the general contractor had capacity to control the employee's work assignment or the tools he employed.  Last, Tarabokia found the general contractor's expectation that on-site subcontractors use occupational expertise and knowledge to monitor and ensure their own workers' safety was objectively reasonable.

To be sure, Tarabokia distinguished its findings from those reached in Carvalho, supra, in that the general contractor in Carvalho was aware of the safety issue of the collapsing trenches, whereas the general contractor in Tarabokia was unaware that the employee used the tool to

begin with, nevertheless that use of the tool without the appropriate gloves was a latent harm which could later develop into a chronic neural syndrome.  Similarly here, CTSI had, at the least, constructive notice of the dangerousness of the scaffolds in question based on the regular visual inspections it conducted of the premises.  Simply put, there was no latent defect here like that in Tarabokia which developed over time and which was not foreseeable.  Additionally, unlike the general contractor in Tarabokia, CTSI maintained a supervisory role over the project, expressly served a liaising role for Honeywell, and was additionally bound to the Honeywell Safety Handbook pursuant to the 2007 MSA.

In sum, Mr. Lopez worked on a scaffold with a wet substance on a plastic-covered scaffold without guardrails.  Mr. Lopez alleges that he somehow slipped and fell.  Here, CTSI served as a project manager and liaison for the premises owner, conducted regular visual inspections of the containment area, and agreed to be bound by the Honeywell Safety Handbook.  Taking the sum of these circumstances under consideration, the Court finds that CTSI owed Mr. Lopez a duty over his working conditions as a matter of law.  CTSI had the opportunity and was in the position to foresee and discover the harm and to exercise reasonable care to avert it.  A reasonable fact-finder may conclude that CTSI's acts or omissions contributed in whole or in part to the fall.  CTSI's motion for summary judgment is therefore denied.

Next, Honeywell moves for summary judgment on the basis that it is not liable for Mr. Lopez's fall as a matter of law.  Ordinarily, a landowner is not liable for the negligent acts of its independent contractor.  See Majestic Realty Assocs., Inc. v. Toti Contracting Co., Inc., 30 N.J. 425, 430-31 (1959).  Exceptions to this general principle exist, however, where the landowner: 1) retains control over the manner and means of the work to be performed; 2) hires an incompetent

contractor; or 3) the work involved constitutes a nuisance *per se*.  Id.  See also Dawson v.

Bunker Hill Plaza Associates, 289 N.J. Super. 309 (App.Div. 1996).

Honeywell argues that it did not breach a duty of care to Mr. Lopez because its sole

involvement in the accident is that of a property owner with no control over the activities of PAR

or CTSI.  Honeywell maintains that it relied on PAR's expertise and CTSI's oversight with

regard to what was being done in the containment area.  To be sure, Honeywell was not barred

from the containment area; Honeywell was permitted to enter so long as accompanied by a

licensed asbestos contractor.  Moreover, Honeywell did not provide the scaffold here and had

limited involvement at the job site.

Nevertheless, Honeywell retained control over the manner and means of the work

performed.  The terms of the Honeywell-PAR contract set forth that "in the event of any unsafe

working condition or work environment at the Job Site, Contractor or Honeywell, as the case

may be, shall immediately notify the other and the work concerned shall be interrupted . . . ."

Additionally, the Honeywell-Par contract provides that "Contractor shall advise Honeywell, and

Honeywell shall advise Contractor whenever a condition at the plant affects the work or

performance of the Work or creates an unsafe condition or work environment."  Moreover,

Honeywell devised a comprehensive safety protocol which it bound both CTSI and PAR to.

Notably, the Honeywell Safety Handbook addresses safety protocol ranging from the provision

of Personal Protective Equipment to precautions for scaffolding of a certain height.

Additionally, the Honeywell Safety Handbook requires that contractors acknowledge receipt and

abide by its terms, and attend an orientation on its contents which is conducted by Honeywell.

Despite its contentions, Honeywell did not need to depend on the expertise of PAR or

CTSI in order to comprehend the safety risk involved here where a worker operated without fall

protection on a scaffold of either five or six feet high, which was affixed with plastic while spraying a slippery substance. The contractual agreement between Honeywell and PAR directs that Honeywell had the capacity to control any unsafe condition or work environment. Honeywell therefore maintained a duty to Mr. Lopez to preserve a safe working environment. A reasonable trier of fact may conclude that Honeywell's acts or omissions contributed in whole or in part to Mr. Lopez's injury, and therefore Honeywell's motion for summary judgment is denied.

Third, Honeywell and CTSI each move for summary judgment on the question of contribution and indemnification. The set of motions is denied due to genuine issues of material fact. CTSI argues that it does not owe Honeywell contractual indemnification because the 2007 MSA does not apply to the Honeywell Project here. Absent evidence to the contrary, as discussed above, the 2007 MSA is relevant although an unresolved genuine issue of material fact remains as to the existence of the 2008 MSA. In turn, Honeywell argues that it is entitled to common law indemnification from CTSI because it had no control over the work being performed by the other parties. As discussed at length above, Honeywell owed a duty as a matter of law to safeguard the working conditions, and a trier of fact could find that Honeywell breached that duty by act or omission thereby causing Mr. Lopez to fall and suffer damages.

Last, CTSI requests leave to file a third-party complaint against PAR. CTSI explains that the request is motivated by Honeywell's year and a half delay in the production of its insurance policy. The Honeywell-PAR Contract provides that PAR shall indemnify and hold "Honeywell, its officers, agents and employees" harmless from and against "any and all liability, damage, loss, cost, expense, claims, demands, suits, actions, judgments, or recoveries . . . arising out of, or in any way occurring directly or indirectly in connection with [PAR's] Work." Thus, CTSI

contends that insomuch as Honeywell is arguing that CTSI operated as its agent, CTSI is entitled to defense and indemnity from PAR.  Additionally, CTSI maintains that the issue of PAR's negligence is already being litigated here, therefore bearing on CTSI's claims for indemnification against PAR.  CTSI argues that because PAR has been on notice of this claim from inception, it will suffer no prejudice as a result of the proposed amendment, and that minimal discovery such as the production of additional expert testimony and the taking of PAR's deposition, causing no undue delay.  CTSI contends that the need to initiate a third-party complaint to pursue a claim for defense and contractual indemnification against PAR manifested itself only recently with the production of the insurance policy.

Federal Rule of Civil Procedure 14(a) provides that a defendant may file a third-party action against "a person not a party in the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff."  Fed. R. Civ. P. 14(a).  The defendant may file a third-party action as a right within ten days after the filing of the original answer.  Beyond that ten day time period, the defendant may only file the action after obtaining leave of the Court.  Id.  "[T]he decision to permit joinder rests with the sound discretion of the trial court." Remington Arms Co. v. Liberty Mut. Ins. Co., 748 F. Supp. 1057, 1068 (D. Del. 1990).  "The law generally provides that courts should permit impleader unless it will delay or disadvantage the existing action and the third-party claim obviously lacks merit." Wilson v. Beekman, 198 Fed. Appx. 239, 241 (3d Cir. 2006) (relying on Charles Alan Wright, Arthur R. Miller & Mary Kate Kane, Federal Practice and Procedure § 1443 (2d ed. 1990)).  Courts have considered the following factors in exercising their discretion on whether to permit impleader under Rule 14(a):  "(1) the timeliness of the motion; (2) the probability of trial delay;

27

(3) the potential for complication of issues at trial; and (4) prejudice to the original plaintiff."
Ronson v. Talesnick, 33 F. Supp. 2d 347, 356 (D.N.J. 1999).

The request to amend the pleadings follows a lengthy and active procedural history which includes CTSI's filing of two motions for summary judgment and a crossmotion for summary judgment, in addition to responsive pleadings to Honeywell's motion for summary judgment. Despite CTSI's complaint that it was only recently made aware of its potential claim for indemnification, CTSI has been long aware of Article VIII of the Honeywell-PAR contract. Article VIII is entitled "Indemnification," and holds Honeywell and its officers, agents, and employees harmless subject to the terms therein. See supra, 5-6. Indeed, CTSI's argument includes no additional revelations regarding the indemnification terms within the insurance policy, but simply relies on Article VIII.

The request is also futile. The express terms of the 2007 MSA provide that CTSI is not to function as Honeywell's agent for any purposes. Even assuming, *arguendo*, that CTSI were an agent of Honeywell, a contract will not be construed to indemnify the indemnitee against losses resulting from its own negligence unless such an intention is expressed in unequivocal terms. See Azurak v. Corporate Property Investors, 175 N.J. 110, 112 (2003) (party not entitled to indemnification for its own negligence under indemnification provision absent explicit contractual language); see also Mantilla v. NC Mall Associates, 167 N.J. 262, 275 (2001) (holding that absent explicit contractual language to the contrary, an indemnitee who has been found to be at least partially at fault may not recover the costs of its defense from an indemnitor).

The Court therefore denies CTSI's request to file a third-party complaint against PAR because it is unduly delayed and would only serve to further defer trial and postpone justice for Mr. Lopez and Ms. Gomez who await recompense for serious and permanent injury suffered.

### III.    CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by CTSI and Honeywell are denied.  A reasonable trier of fact could find that CTSI and Honeywell breached their duties to ensure safe working conditions here and thereby caused the injuries in whole or in part.   Additionally, CTSI's motion for leave to file a third-party complaint against PAR is denied.  The Court will enter an order implementing this opinion.


/s/ Dickinson R. Debevoise
**DICKINSON R. DEBEVOISE, U.S.S.D.J.**


**Date:** July 11, 2014